**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CSM FASTENER PRODUCTS CO.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 11 C 8307** |
| | ) | |
| **E.J. PECK, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Defendant E.J. Peck, Inc. (Peck) has moved pursuant to Federal Rule of Civil

Procedure 12(b)(2) to dismiss the claims of plaintiff CSM Fastener Products Co. (CSM)

for lack of personal jurisdiction.  In the alternative, Peck has moved to transfer the case

to the Eastern District of Michigan pursuant to 28 U.S.C. § 1404(a).  For the reasons

stated below, the Court denies Peck's motions.

**Background**

CSM is an Illinois corporation with its principal place of business in Elk Grove

Village, Illinois.  It manufactures specialized fasteners and makes custom fasteners to

specification.

Peck is a Michigan corporation with its principal place of business in Bloomfield

Hills, Michigan.  It is a manufacturer's representative that specializes in the marketing

and sale of fasteners.  Peck does not maintain a branch office or comparable facilities

in Illinois and does not have a telephone listing or mailing address in Illinois.  Peck also

does not hold bank accounts or tangible personal or real property in Illinois. No Peck employees reside or are domiciled in Illinois, nor has Peck contracted with persons residing in Illinois to market any of its services.

On or about August 1, 2002, CSM and Peck entered into a manufacturer's representative agreement. The party's affidavits provide different accounts of how this contract came into being. Peck contends that the initial contact between the parties took place at an Ohio trade show and that negotiations continued thereafter "by phone, emails, faxes, etc., over a period of months . . . primarily conducted from Michigan." Peck Aff. ¶ 2.

By contrast, CSM contends that Peck approached CSM in late March or early April 2002, when two representatives of Peck visited CSM's facility in Bensenville, Illinois. The Peck representatives told CSM that "they were in town to visit [another company] and thought they'd stop by to find out more about CSM." Weber Aff. ¶ 10. One of the representatives said that Peck had a relationship with one of CSM's competitors and "wanted to get out of it." *Id.* The Peck representatives toured CSM's facility, and CSM contends that "before they left we negotiated the essential terms of a sales representative agreement after exchanging views on what each company wanted." *Id.* Shortly after this visit, Peck faxed a draft contract to CSM's Illinois office, and CSM commented on the draft and sent it back. Peck then sent a signed agreement to CSM, which executed the contract in Illinois.

Over the next nine years, Peck regularly promoted and solicited orders on behalf of CSM to customers, primarily in Michigan. CSM processed these orders from its Illinois facility, shipped products from Illinois to fill those orders, and sent Peck a total of

$906,055.61 in commission payments from Illinois. CSM also contends that throughout their nine-year relationship, CSM and Peck's employees were in daily contact: it says that "[l]iterally thousands of emails, and hundreds of voice telephone calls" were received by CSM in Illinois from Peck in Michigan every year. Ignots Aff. ¶ 10 & Ex. A. These contacts were, CSM contends, "an integral part of Peck's sales function," as their purpose was to convey information about customer needs and orders, quality problems, and issues requiring follow-up. Finally, Jeff Peck, Peck's president, made a total of five trips to Illinois during the parties' relationship.

In December 2010, one of CSM's major Michigan customers contacted CSM to express dissatisfaction with Peck's service. CSM contends that it worked with Peck to improve its performance. In February 2011, frustrated with Peck's poor performance, CSM gave Peck notice of its intent to terminate the parties' contract. In October 2011, CSM filed the present action, seeking a declaratory judgment that it had terminated the contract for cause.

## Discussion

### A.    Personal jurisdiction

A federal district court in Illinois has personal jurisdiction over a party involved in a diversity action only if an Illinois court would have personal jurisdiction. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1275 (7th Cir. 1997). "[W]hen the district court rules on a defendant's motion to dismiss based on the submission of written materials . . . the plaintiff need only make out a *prima facie* case of personal jurisdiction." *See Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003)

(internal quotation marks and citation omitted). Because Peck has submitted affidavits in support of its Rule 12(b)(2) motion, CSM "must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Id.* at 783. Courts resolve factual disputes in the record and conflicting affidavits in the plaintiff's favor. *Id.* at 782-83.

### 1. Illinois long-arm statute

The Illinois long-arm statute provides that an Illinois court may exercise specific jurisdiction over a non-resident defendant if the defendant transacts business in Illinois and those activities give rise to the claim asserted in the suit. 735 ILCS 5/2-209(a)(1), (f). A corporation is engaged in the transaction of business in Illinois if the defendant engaged in "commercial activities" with the state such that it "submitted to the jurisdiction of Illinois courts." *General Elec. Railcar Servs. Corp. v. Wilmington Trust Co.*, 208 Ill. App. 3d 459, 465, 567 N.E.2d 400, 404 (1990). Factors that may be considered are who initiated the transaction with Illinois; where the contract was entered into; and where the contract was to be performed. *Id.*

The facts, with conflicts resolved in CSM's favor, establish that Peck transacted business in Illinois. A similar factual scenario existed in *G.M. Signs, Inc. v. Kirn Signs, Inc.*, 231 Ill. App. 3d 339, 596 N.E.2d 212 (1992), in which the court found that the defendant was subject to personal jurisdiction because it transacted business in Illinois. *Id.* at 345, 596 N.E.2d at 215. In *G.M. Signs*, the defendant initiated negotiations with the plaintiff by traveling to Illinois to inspect the plaintiff's manufacturing facilities and discussing a future business relationship while in Illinois. *Id.* at 344, 596 N.E.2d at 215.

4

The parties then entered into a business arrangement that lasted for several years and involved defendant placing numerous orders with the plaintiff. *Id.*

Like the defendant in *G.M. Signs*, Peck sought out CSM and initiated negotiations on establishing a business relationship. *See id.* Though the parties' affidavits conflict regarding how they initiated their relationship, those conflicts are resolved in CSM's favor for purposes of the present motion. *See Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987). CSM provides evidence that during the previously-referenced visit to Illinois by Peck's representatives, the two companies negotiated "the essential terms of a sales representative agreement." Weber Aff. ¶ 10. Peck and CSM thereafter engaged in an ongoing nine-year business relationship during which, according to CSM, Peck contacted CSM in Illinois on a near-daily basis regarding customer orders. This business relationship is similar to the one at issue in *G.M. Signs*, which involved numerous contacts by the defendant with the Illinois plaintiff. *G.M. Signs*, 231 Ill. App. 3d at 344, 596 N.E.2d at 215.

Peck contends that the facts of the present case are nearly identical to those in *Blanco Oso Int'l Trading Co. v. Southern Scrap Material Co.*, 735 F. Supp. 294, 297 (N.D. Ill. 1990), in which the court found that the defendant had not transacted business in Illinois. Unlike in the present case, however, the plaintiff in *Blanco Oso* sought out a business relationship with the defendant, a Louisiana corporation, and all of their negotiations took place outside of Illinois. *Id.* at 296. Moreover, the defendant in *Blanco Oso* did not engage in an ongoing business relationship with the Illinois plaintiff. Rather, performance of the contract only involved one shipment of scrap from the Virgin

Islands to the defendant's principal place of business in Louisiana. *Id.* Indeed, the only contact the defendant made with the Illinois plaintiff was to send a single advance payment for the scrap to the plaintiff's principal place of business. *Id.* In short, the defendant in *Blanco Oso* had nowhere near the level of pertinent contacts with Illinois that the evidence shows concerning Peck.

In sum, the Court concludes that Peck transacted business in Illinois within the meaning of section 2-209(a). Because CSM's claim arises from those contacts, the statute authorizes a court in Illinois to exercise specific jurisdiction over Peck. *See* 735 ILCS 5/2-209(f).

### 2. Due process requirements

Once a plaintiff shows that an Illinois court may exercise personal jurisdiction over the defendant pursuant to the long-arm statute, a court must determine whether doing so is consistent with federal and state due process requirements. *Neuman & Assocs., Ltd. v. Florabelle Flowers, Inc.*, 15 F.3d 721, 725 (7th Cir. 1994). The Illinois Constitution permits the assertion of jurisdiction over an out-of-state defendant where "it is fair, just, and reasonable . . . considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *Citadel Group Ltd. v. Wash. Reg'l Med. Ctr.*, 536 F.3d 757, 761 (7th Cir. 2008). No case has yet emerged in which due process was satisfied under the federal constitution but not under the Illinois constitution. *Id.* For this reason, the Court will confine its discussion to the federal due process analysis.

Due process allows a state to exercise jurisdiction over a defendant only if the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notations of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). A state has an interest in providing its residents with a forum for redressing harms caused by an out-of-state actor, particularly where the out-of-state actor has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985). The defendant's contacts must be such that the defendant should "'reasonably anticipate being haled into court there.'" *Id.* at 474-75 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

Peck engaged in contacts with Illinois sufficient to subject it to personal jurisdiction here. In *Burger King*, the Supreme Court concluded that the exercise of jurisdiction over the defendant in Florida did not offend due process. *Id.* at 478. First, the defendant "deliberately reach[ed] out beyond" his home state and negotiated with a Florida corporation to establish a long-term business relationship. *Id.* at 466, 479. The defendant then entered into a twenty-year relationship with the plaintiff that "envisioned continuing and wide-reaching contacts" with Florida, such as monthly payments and the purchase of equipment. *Id.* at 468, 481.

Similarly, the evidence reflects that Peck deliberately reached out beyond its home state of Michigan to initiate a business relationship with CSM, an Illinois entity. Peck sent representatives to CSM's facility in Illinois. They indicated that they wanted

7

to begin a business relationship with CSM and negotiated the essential terms of the parties' business relationship. Peck then entered into a business relationship with CSM that lasted nearly nine years. Like the business relationship in *Burger King*, the relationship between Peck and CSM involved continuing and significant contacts by Peck with Illinois. Daily contact was "an integral part of Peck's sales function" to convey information about customer needs and orders, quality problems, and issues requiring follow-up. Weber Aff. ¶ 17. Consequently, Peck purposefully availed itself of the benefits and protections of Illinois laws and reasonably should have anticipated being haled into court here.

For these reasons, the Court denies Peck's motion to dismiss for lack of personal jurisdiction.

**B.      Transfer under 28 U.S.C. § 1404(a)**

Peck moves in the alternative to transfer the case to the Eastern District of Michigan pursuant to 28 U.S.C. § 1404(a). Transfer is appropriate if venue and jurisdiction are proper in the transferee district and transfer will serve the convenience of parties and witnesses and the interest of justice. *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219 n. 3 (7th Cir. 1986). As the party seeking transfer, Peck has the burden of demonstrating that the proposed alternative forum, the Eastern District of Michigan, is clearly more convenient than this district. *See id.* at 219-20.

Peck is a resident of Bloomfield Hills, Michigan, a city in Oakland County, which is within the Eastern District of Michigan. *See* 28 U.S.C. § 102(a). Therefore, venue

8

and jurisdiction are proper in the Eastern District of Michigan, where Peck seeks to transfer this case.

Because venue and jurisdiction are proper in the proposed transferee court, the Court must first assess whether transfer would serve the convenience of the parties and the witnesses. The Court considers the plaintiff's choice of forum; the situs of material events; the relative ease of access to sources of proof; the convenience of the witnesses; and the convenience of the parties of litigating in the respective forums. *See, e.g., Brandon Apparel Group, Inc. v. Quitman Mfg. Co.*, 42 F. Supp. 2d 821, 833 (N.D. Ill. 1999).

Peck contends that Michigan is the situs of the material events because that is where the alleged breach occurred. Peck also contends that all of the evidence, as well as Peck's potential witnesses, are located in Michigan. CSM counters this by stating that there are twenty-two current and former employees who interacted with Peck during the course of its relationship with CSM who are potential witnesses and that all twenty-two reside in Illinois. CSM also identifies six other potential witnesses, specifically, its customers in Michigan who, CSM contends, can attest to Peck's poor performance. CSM states that these customers all reside in the Western District of Michigan, rather than in the Eastern District of Michigan (where Peck seeks to transfer the case) and that Chicago is an equally or more convenient forum for them than Detroit. CSM also contends that all records relevant to this dispute are with CSM in Illinois because it received and recorded all customer complaints here.

Although Peck does not provide details regarding the number of potential witnesses residing in Michigan, it appears that the potential witnesses and business

9

records are located in both Illinois and Michigan. The balance of inconvenience, in terms of witness travel and the ability to subpoena witnesses for trial, is therefore roughly equal. With regard to records, the Court cannot say that Peck would experience more inconvenience in transporting records here than CSM would experience were the case transferred. Consequently, the convenience factors do not weigh in favor of transfer.

Next, the Court must determine whether the transfer is in the interest of justice. In evaluating this, the Court considers the respective courts' familiarity with the applicable law; the speed at which the case will proceed to trial; and the desirability of resolving controversies in their locale. *See, e.g., First Nat'l Bank v. El Camino Resources, Ltd.*, 447 F. Supp. 2d 902, 912 (N.D. Ill. 2006).

The agreement between Peck and CSM calls for the application of Michigan law. That said, there is no reason to believe that there is anything peculiar about contract law in Michigan that would make it more difficult for a judge in this district to apply.

On the other side of the ledger, CSM's principal place of business is in Illinois. There is a local interest in providing a forum in which an Illinois resident, CSM, can resolve its dispute with an out-of-state corporation.

Peck and CSM each contends that its proposed district is less congested. Based on published statistics, the average time to trial in the Northern District of Illinois was 24.8 months as of March 2011, while the average time to trial in the Eastern District of Michigan was 20.1 months. This is not a significant difference. In any event, general statistics of this sort are, in this Court's view, relatively meaningless in the section 1404(a) analysis. They consist of averages for cases of all types and tell the

reader nothing about cases of the particular type at issue. In addition, the Court is prepared to advance the case to trial in well under eighteen months. This factor does not tilt the balance one way or the other.

In short, the public interest factors do not weigh in favor of transfer.

Though each party spends considerable time addressing the degree of deference the Court should give to the plaintiff's choice of forum, the Court need not decide that point definitively. Neither the convenience factors nor the public interest factors favor transfer. The Court therefore denies Peck's motion to transfer.

## Conclusion

For the reasons stated above, the Court denies defendant's motion to dismiss for lack of personal jurisdiction and its motion to transfer [docket no. 7].

_____
MATTHEW F. KENNELLY
United States District Judge

Date: February 15, 2012

11